## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ALTEGRITY, INC., *et al*[1],<br><br>                Debtors. | Chapter 11<br>Bankr. Case No. **15-10226-LSS**<br>(Joint Administration Pending) |
| THOMAS KARANIEWSKY and ANGELA RODRIGUEZ, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>    v.<br><br>ALTEGRITY, INC., ALTEGRITY ACQUISITION CORP., ALTEGRITY HOLDING CORP., and US INVESTIGATIONS SERVICES, LLC.<br><br>                Defendants. | **Adv. Pro. No. 15-50204 (LSS)** |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE ADVERSARY COMPLAINT

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Altegrity, Inc. (9985); Albatross Holding Company, LLC (2688); Albatross Marketing and Trading, LLC (8643); Altegrity Acquisition Corp. (1480); Altegrity Holding Corp. (1481); Altegrity Risk International LLC (6350); Altegrity Security Consulting, Inc. (5452); CVM Solutions, LLC (9526); D, D & C, Inc. (9552); Engenium Corporation (2269); FDC Acquisition, Inc. (2387); HireRight Records Services, Inc. (1944); HireRight Solutions, Inc. (8954); HireRight Technologies Group, Inc. (1660); HireRight, Inc. (5016); John D. Cohen, Inc. (1738); KCMS, Inc. (0085); KIA Holding, LLC (1333); Kroll Associates, Inc. (6880); Kroll Background America, Inc. (4830); Kroll Crisis Management Group, Inc. (3811); Kroll Cyber Security, Inc. (2393); Kroll Factual Data, Inc. (9911); Kroll Holdings, Inc. (4648); Kroll Inc. (1019); Kroll Information Assurance, Inc. (2283); Kroll Information Services, Inc. (2381); Kroll International, Inc. (1243); Kroll Ontrack Inc. (1650); Kroll Recovery LLC (7082); Kroll Security Group, Inc. (5514); National Diagnostics, Inc. (7132); Ontrack Data Recovery, Inc. (3148); Personnel Records International, LLC (0716); The Official Information Company (1805); US Investigations Services, LLC (9260); USIS International, Inc. (3617); and USIS Worldwide, Inc. (4258). The location of the Debtors' corporate headquarters is 7799 Leesburg Pike, Suite 1100 North, Falls Church, VA 22043.

# **Table of Contents**

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 2

LEGAL BACKGROUND ...................................................................................................... 4

    639.1

    B.      Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure ...................................... 5

ARGUMENT ........................................................................................................................ 7

    A.   PLAINTIFFS' ALLEGATIONS, TOGETHER WITH DEFENDANTS' BANKRUPTCY FILINGS SUPPORT A PLAUSIBLE INFERENCE THAT THE ALTEGRITY ENTITIES AND USIS WERE A SINGLE EMPLOYER ........................................................................ 7

        1.    The Court should take judicial notice of certain of Defendants' bankruptcy filings. ... 7

        2.    The Single Employer Standard ................................................................................... 11

        3.    Plaintiffs state a plausible claim for relief against the Altegrity Entities ..................... 13

    B.   PLAINTIFFS STATE A CLAIM FOR TERMINATION FROM A SINGLE SITE OF EMPLOYMENT WITH 50 EMPLOYMENT LOSSES ......................................................... 20

        1.    The relevant WARN Act regulation applies to Plaintiffs and the employees .............. 21

        2.    Plaintiffs made sufficient factual allegations to supporting application of the "mobile workers" regulation to their claims ................................................................................... 29

    C.   IF THE COMPLAINT IS DISMISSED, PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND ................................................................................................................ 31

CONCLUSION .................................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S.Ct. 1937 (2009) ........................................................................... *passim*

*In re APA Transp. Corp. Consol. Litig.*,
  541 F.3d 233, 245 (3d Cir. 2008) .................................................................................12

*Azzata v. American Bedding Industries, Inc.*,
  432 B.R. 115 (Bankr. D. Del. 2010) .................................................................18, 19, 32

*Bader v. N. Line Layers, Inc.*,
  503 F.3d 813 (9th Cir. 2007) .........................................................................................28

*Bausch v. Strkyer Corp.*,
  630 F.3d 546 (7th Cir. 2010) ......................................................................................5, 20

*Bell Atlantic v. Twombly*,
  550 U.S. 544 (2006) ..............................................................................................5, 6, 30

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ...........................................................................................5

*Brinkmeier v. Graco Children's Prods.*,
  767 F. Supp. 2d 488 (D. Del. 2011) ..........................................................6, 7, 19, 31

*Ciarlante v. Brown & Williamson Tobacco Corp.*,
  143 F.3d 139 (3d Cir. 1998) ................................................................................ *passim*

*Covington v. International Association of Approved Basketball Officials*,
  710 F.3d 114 (3d Cir. 2013) ............................................................................................6

*Czarniak v. Entertainment Publications, LLC (In re Entertainment Publications, LLC)*
  2014 Bankr. LEXIS 1556 (Bankr. D. Del. Mar. 12, 2014) ...............................18, 32

*Erickson v. Pardus*,
  551 U.S. 89 (2007) ...........................................................................................................6

*Fergueson v. Barnhart*,
  52 F. App'x 112 (10th Cir. 2002) .................................................................................27

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009)..................................................................................7, 18

*Gray v. Oracle Corp.*,
    No. 2:05-CV-534 TS, 2005 WL 3132344 (D. Utah Nov. 22, 2005) ......................28

*Hampton v. Navigation Capital Partners*,
    2014 WL 4100418 (D. Del. 2014)...............................................................14, 19

*Hechinger Investment Co. v. Raytheon Co. (In Re Hechinger Investment Co.)*,
    286 B.R. 591 (Bankr. D. Del. 2002) ...........................................................31

*In re Insilco Technologies, Inc.*,
    291 B.R. 628 (Bankr. D. Del. 2003) ............................................................8

*Jones v. Burton*,
    No. 05-C-527-C, 2005 WL 2373859 (W.D. Wis. Sept. 26, 2005) *aff'd*, 173 F.
    App'x 520 (7th Cir. 2006) .......................................................................28

*Kephart v. Data Sys. Int'l, Inc.*,
    243 F. Supp. 2d 1205 (D. Kan. 2003) .....................................................22, 28

*In re Kesler*,
    2013 WL 653089 (Bankr. D. N.J. Feb. 21, 2013) .........................................9

*Krupski v. Costa Crociere S. p. A.*,
    130 S. Ct. 2485 (2010)............................................................................5

*In re LandSource Communities Dev. LLC*,
    476 B.R. 454 (Bankr. D. Del. 2012) ...........................................................9

*In re LandSource Communities Dev. LLC*,
    485 B.R. 310 (Bankr. D. Del. 2013) ...........................................................8

*Meson v. GATX Tech. Servs. Corp.*,
    507 F.3d 803 (4th Cir. 2007) ............................................................24, 25, 26

*Meyers v. Heffernan*,
    740 F. Supp. 2d 637 (D. Del. 2010).............................................................9

*MIG Investments LLC v. Aetrex Worldwide, Inc.*,
    852 F. Supp. 2d 493 (D. Del. 2012)............................................................6

*Monroe v. Mullooley*,
    No. CIV. 10-1208, 2011 WL 337333 (W.D. Pa. Feb. 3, 2011)...........................7

*Moore v. Warehouse Club, Inc.*,
    992 F.2d 27 (3d Cir.1993).......................................................................26

*Murray v. Miner*,
  74 F.3d 402 (2d Cir. 1996) ................................................................................................... 11

*In re New Century TRS Holdings, Inc.*,
  390 B.R. 140 (Bankr. D. Del. 2008) *rev'd on other grounds*, 407 B.R. 576 (D.
  Del. 2009) ............................................................................................................................... 8

*New v. Dep't of Veterans Affairs*,
  142 F.3d 1259 (Fed. Cir. 1998) ........................................................................................... 27

*In re Olick*,
  517 B.R. 549 (Bankr. E.D. Pa. 2014) ................................................................................... 9

*Otter Products, LLC v. Treefrog Developments Inc.*,
  No. 11-CV-02180-WJM-KMT, 2012 WL 4468211 (D. Colo. Sept. 27, 2012) ..................... 27

*Pearson v. Component Tech. Corp.*,
  247 F. 3d 471 (3d Cir. 2001) ...................................................................................... *passim*

*Phillips v. Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ............................................................................................ 5, 7

*In re Pitt Penn Holding Co., Inc.*,
  2011 WL 4352373 (Bankr. D. Del. Sept. 16, 2011) .............................................................. 9

*Sanchez v. AFA Foods, Inc. (In re AFA Inv., Inc.)*,
  2012 Bankr. LEXIS 5764 (Bankr. D. Del. Dec. 14, 2012) .............................................. 18, 32

*In re Scholl*,
  1998 WL 546607 (Bankr. E.D. Pa. Aug. 26, 1998) ............................................................... 8

*In re Sheckard*,
  386 B.R. 118 (Bankr. E.D. Pa. 2008) *aff'd*, 394 B.R. 56 (E.D. Pa. 2008) .......................... 8

*Skinner v. Switzer*,
  131 S. Ct. 1289 (2011) ........................................................................................................... 6

*In re Storehouse, Inc.*,
  2010 WL 4453849 (Bankr. E.D. Va. Nov. 3, 2010) ..................................................... *passim*

*StrikeForce Technologies, Inc. v. PhoneFactor, Inc.*,
  2013 WL 6002850 (D. Del. Nov. 13, 2013), *as amended* (Nov. 14, 2013)........................... 10

*Tracinda Corp v. Daimler Chrysler AG (In Re Daimler Chrysler AG Sec. Litig.)*,
  200 F. Supp. 2d 439 (D. Del. 2002) ..................................................................................... 31

*United Steelworkers of Am., AFL-CIO-CLC v. Crown Cork & Seal Co., Inc.*,
32 F.3d 53 (3d Cir. 1994) *aff'd sub nom. N. Star Steel Co. v. Thomas*, 515
U.S. 29 (1995)................................................................................................4, 26

*Vogt v. Greenmarine Holding, LLC*,
318 F. Supp. 2d 136 (S.D.N.Y. 2004)...................................................................14

*White v. United States*,
601 F.3d 545 (6th Cir. 2010) ...................................................................................6

*Woolery v. Matlin Patterson Global Advisers, LLC*,
CA 12-726-RGA, 2013 WL 1750429 (D. Del. Apr. 23, 2013) ........................11, 13

**Statutes**

Worker Adjustment Retraining and Notification Act, 29 U.S.C. § 2101 *et seq.*............................4

**Other Authorities**

20 C.F.R. § 639.1 ...................................................................................................26

20 C.F.R. § 639.3(i)(3)...........................................................................................33

20 C.F.R. § 639.3(i)(6)............................................................................... *passim*

20 C.F.R. § 639.3(i)(8)...........................................................................................33

20 C.F.R. § 639.3(a)(1)(2) .....................................................................................12

Fed. R. Civ. P. 8 and 8(a)(2) ...................................................................................7

Fed. R. Civ. P. 9(a) ..................................................................................................6

Fed. R. Civ. P. 12(b)(6)........................................................................................5, 9

Fed. R. Civ. P. 12(d) .............................................................................................8, 9

Fed. R. Civ. P. 26(f)................................................................................................21

Fed. R. Civ. P. 56(d) ...........................................................................................8, 10

**<u>INTRODUCTION</u>**

On August 7, 2014 the U.S. government halted Altegrity's background check service, US Investigations Services, LLC.  That put the renewal of its contracts with the government in jeopardy.  The danger of non-renewal triggered the WARN Act obligation to inform its employees that they faced termination at the end of September if the contracts were not renewed. Altegrity told them nothing.  This was a clear a violation of the WARN Act.

Defendants Altegrity, Inc., Altegrity Acquisition Corp., Altegrity Holding Corp. (collectively, the "Altegrity Entities"), recognize one way to duck this liability is by contending that the Complaint does not in fact adequately allege they were a single employer with their wholly-owned US Investigations Services, LLC ("USIS") division.  Defendants point to no case in which the single employer allegations against an operating unit and its holding company parents, however naked, were found inadequate under the *Iqbal* standard.

Plaintiffs' Complaint meets all the single employer standards when read with the judicial experience required by *Iqbal* and when taking judicial notice of the Debtors' bankruptcy filings, which is allowed in this Circuit.   First and foremost, Defendants are liable as single-employer parents because they made the ultimate decision to terminate USIS employees.  Driving Altegrity to this bankruptcy was its need to staunch losses and seek protection from its USIS hot potato.  It had the right to shutter USIS, but not without the WARN-required notice.  Moreover, despite Defendants' cult-like secrecy, its redacted bankruptcy filings nevertheless reveal that they are highly interconnected entities.  Having striven for invisibility, Defendants can hardly hold Plaintiffs responsible for failing in their notice pleading to expose the totality of their inner workings.

Defendants also seek to evade WARN liability by claiming Plaintiffs failed to adequately allege that they were terminated from a *single site* of employment at which 50 employment losses occurred.  The Complaint does allege, however, that the Plaintiffs were field investigators working from their cars and homes.  Under well-established Third Circuit precedent, their WARN Act single site was the point of origination and destination of their investigation assignments – Defendants' Grove City facilities, where hundreds, if not thousands were terminated.  Tellingly, USIS did not move to dismiss near-identical allegations in the predecessor of this suit that is now stayed.

*Iqbal* dismissals are routinely re-plead, triggering more rounds of motion practice over months.  Perhaps calculatedly, Defendants seek to delay the disposition of this case until after the Defendants' self-created race horse of a bankruptcy has left the barn.

For all the foregoing reasons, Plaintiffs' Complaint should not be dismissed.  The Court should take judicial notice of Defendants' filings and allow Plaintiffs' claims to be adjudicated on the merits. If necessary, the Court should convert the relevant portion of Defendants' motion to a motion for summary judgment and permit Plaintiffs adequate discovery.  However, even if the Complaint is dismissed, in whole or in part, the Court should pay no heed to Defendants' cynical request that Plaintiffs not be granted leave to replead on the ground of futility and permit Plaintiffs an opportunity to add additional factual allegations in support of their claims.[2]

## STATEMENT OF FACTS

The Altegrity Entities are non-operating entities (*see, e.g.*, D.I. 240 p. 22:1-3) who, through their USIS divisions, performed background service checks and other services for the United States federal government. (D.I. 15 [first day declaration of Jeffrey Campbell ("Campbell

---

[2] Plaintiffs concede that their claim should not be awarded an administrative expense priority as a matter of law. Accordingly, they consent to the dismissal of that prayer for relief and do not seek leave to replead on that issue.

Declaration")] at ¶¶ 15-16.)[3]  USIS was formed in 1996 as the product of the privatization of a

unit of the United States Office of Personnel Management.  (*Id.* at ¶ 15.)  Beginning in 2012,

USIS came under government investigation relating to its submission of false claims for

reimbursement under its OPM contracts and in 2014 the Department of Justice intervened in a

False Claims Act action that had been brought against USIS.  (*See* D.I. 335 p. 97.)  After USIS

reported that it was the subject of a state-sponsored cyber-attack, on August 6, 2014, OPM

advised USIS to suspend all work on a substantial OPM contract.  (D.I. 15 [Campbell

Declaration] at ¶ 8.)  At that point, Plaintiffs and other similarly situated employees were placed

on indefinite furlough.  (*Id.* ¶ 56; D.I. 1 ["Complaint"] at ¶ 1.)  On September 9, 2014, OPM

informed USIS that it would not exercise its remaining options on two significant contracts it had

with USIS and the contracts expired by their terms on September 30, 2014.  (D.I. 15 at ¶¶ 58-61.)

After USIS was advised that its major contracts with the Government would not be

renewed, on or about September 24, 2014, Plaintiffs and approximately 2000 other employees of

USIS received a letter stating that they would be fired six days later.  (D.I. 1 at ¶ 1.)  Thus, on or

about September 30, 2014, Defendants terminated the employment of Plaintiffs and, on

information and belief, approximately 2000 other full-time employees.  (*Id.*)[4]

Prior to their termination, on information and belief, Plaintiffs' and other similarly

situated employees received assignments from and filed reports to Defendants' Grove City,

Pennsylvania and/or Falls Church, Virginia facilities (the "Facilities").  (*Id.* ¶¶ 10-11, 22.)  On

information and belief, these Facilities had more than 50 employees at all times relevant to the

Complaint.  (*Id.* ¶ 16.)  Plaintiffs and other similarly situated employees were terminated as part

---

[3] As demonstrated below, the Court may take judicial notice of the Defendants' and debtors' filings in the main
bankruptcy case and need not convert Defendants' motion to a motion for summary judgment in order to consider
these documents.

[4] Plaintiffs have filed a motion for class certification concurrently herewith.

of mass layoffs and/or plant closings conducted by Defendants, as those terms are defined in the

Worker Adjustment Retraining and Notification Act ("WARN Act"), 29 U.S.C. § 2101 *et seq*.

(*Id*. ¶ 23.)  These mass layoffs and plant closings resulted in employment losses for at least 50 of

Defendants' employees and 33% of the workforce at the Facilities.  (*Id*. ¶ 40.)  Defendants didn't

give Plaintiffs and their terminated employees 60 days' notice of their termination.  (*Id*. ¶¶ 1, 3.)

On February 8, 2015, Defendants, along with a number of affiliated entities, filed for

bankruptcy.  On February 9, 2015, Plaintiffs brought this action on behalf of themselves and the

other similarly situated former employees of Defendants who were terminated by Defendants

without being given 60 days written notice of their terminations as required by the WARN Act.

(*See id. passim*.)  Plaintiffs and all similarly situated former employees seek to recover 60 days

wages and benefits pursuant to the WARN Act.  (*Id*.)

During the pendency of the bankruptcy, Defendants have filed declarations, schedules

and statements of financial affairs ("SOFA") that disclose facts that demonstrate the plausibility

of Plaintiffs claims against Defendants and particularly the plausibility of successful claims

against the Altegrity Entities on a single employer theory because of the nature of Defendants'

corporate structure, their shared officers and directors, and a number of other shared

characteristics, policies and services.  (*See infra*, discussing the details of the relevant filings.)

## LEGAL BACKGROUND

### A.  THE WARN ACT

The WARN Act is a remedial statute that serves very broad societal goals – to protect

workers, their families, and their communities in the wake of potentially harmful employment

decisions*.  United Steelworkers of Am., AFL-CIO-CLC v. Crown Cork & Seal Co., Inc.,* 32 F.3d

53, 58 (3d Cir. 1994) *aff'd sub nom. N. Star Steel Co. v. Thomas*, 515 U.S. 29 (1995).  To

promote this goal, the WARN Act contains a single employer doctrine which relaxes the strictures of common law corporate veil piercing and allows employees terminated in shut downs to seek redress from parents of their nominal employer when the parent has made the ultimate decision to shut its division down. *See generally*, *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 486-488 (3d Cir. 2001).

### B. Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure

In *Iqbal* and *Twombly*, the Supreme Court held that to satisfy Rule 8, claims must be "plausible on [their] face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (*quoting Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2006). Plausibility requires nothing more than a "short and plain statement," Rule 8(a)(2), that gives "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555; *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (purpose of Rule 8 is to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,' and that does not require "detailed factual allegations." *quoting Twombly,* 127 S.Ct. at 1964.

Rule 8 is "meant to focus litigation on the merits of a claim rather than on technicalities that might keep plaintiffs out of court." *Bausch v. Strkyer Corp.*, 630 F.3d 546, 559 (7th Cir. 2010) (internal quotation marks omitted); *cf. Krupski v. Costa Crociere S. p. A.*, 130 S. Ct. 2485, 2494 (2010) (the Rules express a preference "for resolving disputes on their merits"). A complaint meets this standard if it tells a coherent story that "suggest[s]" the elements of the plaintiff's claim. *Iqbal*, 129 S. Ct. at 1950; *Twombly*, 550 U.S. at 556. In this regard, complaints must be construed "as a whole, not parsed piece by piece[.]" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

The plausibility pleading standard "is not akin to a 'probability requirement.'" *Covington v. International Association of Approved Basketball Officials,* 710 F.3d 114, 116 (3d Cir. 2013) *quoting Iqbal,* 556 U.S. at 678; *Twombly,* 550 U.S. at 556.  A claim may be plausible even if it is "improbable" and the prospects for recovery "very remote and unlikely." *Twombly*, 550 U.S. at 556 (citation omitted); *see also Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011) (on a motion to dismiss, the question is "not whether [the plaintiff] will ultimately prevail").  All factual allegations must be taken as true, even if "doubtful in fact."  *MIG Investments LLC v. Aetrex Worldwide, Inc.,* 852 F. Supp. 2d 493, 502 (D. Del. 2012), *citing Twombly*, 550 U.S. at 555.  Moreover, a claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *MIG Investments LLC, supra*, *quoting Iqbal*, 129 S.Ct. at 1949.  This rule applies with full force to allegations that are generally worded, without "[s]pecific facts."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).  Specific facts are not necessary; the statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.*, *quoting Twombly,* 550 U.S. 544, 555.  According to the Third Circuit, *Iqbal* and *Twombly* "make it clear that a claimant does not have to 'set out in detail the facts upon which he bases his claim.'" *Covington*, 710 F.3d at 118, *quoting Twombly*, 550 U.S. at 556.  Even when pleadings require particularity, as under Fed. R. Civ. P. 9(a), "a plaintiff is not required to allege every material detail - such as date, location, or time" but must only plead with "sufficient particularity to place defendants on notice of the precise misconduct with which they are charged."  *Brinkmeier v. Graco Children's Prods.,* 767 F. Supp. 2d 488, 492, 496 (D. Del. 2011) (citation and internal quotation omitted).  Indeed, courts "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."  *White v. United States*, 601 F.3d 545, 551 (6th Cir. 2010) (citation omitted).

To survive a motion to dismiss, a plaintiff "need not plead facts that foreclose the possibility of its not prevailing at trial." *Brinkmeier*, 767 F. Supp. 2d at 495-96.

Finally, "even post-*Twombly,* it has been noted that **a plaintiff is not required to establish the elements of a *prima facie* case** but instead, need only put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (citation omitted; emphasis added).  "Complaints 'need not plead law or match facts to every element of a legal theory.'" *Monroe v. Mullooley*, No. CIV. 10-1208, 2011 WL 337333, at *1 (W.D. Pa. Feb. 3, 2011) *quoting Weston v. Pennsylvania,* 251 F.3d 420, 429 (3d Cir. 2001).  In other words, "'stating . . . a claim requires a complaint with enough factual matter (taken as true) to **suggest**' the required element." *Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir. 2008) *quoting Twombly,* 127 S.Ct. at 1965 (emphasis added).

## ARGUMENT

### A. PLAINTIFFS' ALLEGATIONS, TOGETHER WITH DEFENDANTS' BANKRUPTCY FILINGS SUPPORT A PLAUSIBLE INFERENCE THAT THE ALTEGRITY ENTITIES AND USIS WERE A SINGLE EMPLOYER

#### 1. The Court should take judicial notice of certain of Defendants' bankruptcy filings.

While Defendants seek to hide behind a veil of secrecy, their bankruptcy filings reveal that the Altegrity Entities and USIS are deeply connected and suggest that USIS could not and would not have made the decision to terminate Plaintiffs and its other employees without the Altegrity Entities instruction or authorization.  The Court should respectfully take judicial notice of these filings.

In the alternative, the Court should convert that branch of Defendants' motion that seeks dismissal of the complaint against the Altegrity Entities for failure to adequately allege that they

acted as a single employer with USIS to a motion for summary judgment and defer consideration

of that motion until after discovery.  *See* Fed. R. Civ. P. 12(d) and 56(d).

    A bankruptcy court may take judicial notice of a debtor's filings as follows:

> **A bankruptcy court may take judicial notice, under Fed.R.Evid. 201
> (incorporated into bankruptcy cases by Fed. R. Bankr. P. 9017), of the
> docket entries and the bankruptcy petition, schedules, and statement of
> financial affairs filed in a case.**  *See Maritime Elec. Co., Inc. v. United Jersey
> Bank,* 959 F.2d 1194, 1200 n.3 (3d Cir. 1991); *Levine v. Egidi,* 1993 WL 69146 at
> *2 (N.D. Ill. 1993); *In re Paolino,* 1991 WL 284107 at *12 n. 19 (Bankr. E.D. Pa.
> 1991); *see generally In re Indian Palms Assoc., Ltd.,* 61 F.3d 197 (3d Cir. 1995).
> Although a court may not take judicial notice sua sponte of the facts contained in
> the debtors' files that are in dispute, *In re Aughenbaugh,* 125 F.2d 887 (3d Cir.
> 1942), it may take judicial notice of adjudicative facts "not subject to reasonable
> dispute ... [and] so long as it is not unfair to a party to do so and does not
> undermine the trial court's factfinding authority." *In re Indian Palms Assoc., Ltd.,*
> 61 F.3d 197, 205 (3d Cir. 1995) (citing Fed.R.Evid. 201(f) advisory committee
> note (1972 proposed rules)).

*In re Sheckard*, 386 B.R. 118, 124 (Bankr. E.D. Pa. 2008) *aff'd*, 394 B.R. 56 (E.D. Pa.

2008) (emphasis added); *see also In re LandSource Communities Dev. LLC*, 485 B.R. 310, 315

(Bankr. D. Del. 2013) (noting that "[i]t is not unusual for a Court to take judicial notice of its

docket" and taking judicial notice of pleadings, orders, and excerpts from the Plan in determining

motion for summary judgment in contested matter); *In re New Century TRS Holdings, Inc.*, 390

B.R. 140, 147-48 n. 10, 11 (Bankr. D. Del. 2008) *rev'd on other grounds*, 407 B.R. 576 (D. Del.

2009) (taking judicial notice of certain parts of the Examiner's Report and that the "Debtors

listed their pre-petition assets at $12,905,606,046.91 and liabilities at $11,476,388,868.31" in

each of Debtor's bankruptcy schedules in considering objection to Plan); *In re Insilco*

*Technologies, Inc.*, 291 B.R. 628, 633 (Bankr. D. Del. 2003) ("I take judicial notice of the cash

collateral and administrative orders."); *In re Scholl*, 1998 WL 546607, at *1 (Bankr. E.D. Pa.

Aug. 26, 1998) ("I take judicial notice of the docket and the contents of the Debtor's schedules

pertaining to the IRA.")

Moreover, this rule allows a bankruptcy court to take judicial notice of filings in the main bankruptcy case in making determinations in an adversary proceeding. *See In re LandSource Communities Dev. LLC*, 476 B.R. 454, 456 (Bankr. D. Del. 2012) (taking judicial notice of "First Day Declaration" in deciding cross-motions for summary judgment in adversary proceeding); *see also In re Olick*, 517 B.R. 549, 554 n.7 (Bankr. E.D. Pa. 2014) (taking judicial notice of docket entries and documents filed in the main bankruptcy case and adversary proceedings and granting summary judgment in adversary proceeding); *In re Kesler*, 2013 WL 653089 at *6 (Bankr. D. N.J. Feb. 21, 2013) (taking judicial notice of the fact that the debtors' schedules did not disclose certain claims and holding that debtors were estopped from asserting such claims in adversary proceeding).

Finally, "well-established case law permits the Court to take judicial notice of documents that are . . . matters of public record . . . without converting the Motion to a motion for summary judgment under Federal Rule of Civil Procedure 12(d)." *See In re Pitt Penn Holding Co., Inc.*, 2011 WL 4352373, at *12 (Bankr. D. Del. Sept. 16, 2011) (taking judicial notice of allegations in complaint in adversary proceeding in ruling on motion to dismiss other adversary proceeding) *citing Sands v. McCormick,* 502 F.3d 263, 268 (3d Cir. 2007) (finding that contents of documents appearing on a court's docket are proper subject for judicial notice at the motion to dismiss stage) (other citations omitted); *see also Meyers v. Heffernan*, 740 F. Supp. 2d 637, 641 (D. Del. 2010) ("The court may take judicial notice of documents from the docket of a bankruptcy proceeding in considering a motion to dismiss under Rule 12(b)(6).").

Here, Defendants have disclosed a variety of information regarding their corporate structure, directors and officers, insurance coverage, and tax treatment that all bear on the issue of single employer liability. The Defendants' disclosures, filed in the underlying bankruptcy, are

matters of public record which are not subject to reasonable dispute by Defendants because they are taken from their own filings.  It would also not be unfair to Defendants for their own disclosures to be considered in opposition to their motion because they were aware of their contents when they filed this motion and they still have an opportunity for reply.  Further, it does not undermine the trial court's fact finding authority to consider these facts on a motion to dismiss because the relevant facts would all be subject to proof on summary judgment or at trial – here, the existence of these disclosures simply aids the Court in determining whether Plaintiffs have stated a plausible claim for relief.  Therefore, the Court may take judicial notice of the contents of these documents.

Moreover, it is in the interest of judicial economy for the Court to consider these facts on this motion rather than on a potential motion to dismiss an amended complaint, which would require the Court to consider an entirely new set of briefs.  Accordingly, the Court should take judicial notice of the facts set forth in Defendants' declarations, schedules and statements of financial affairs that Plaintiffs rely on in this brief.

In the alternative, if the Court declines to take judicial notice of these facts, it should convert the single employer branch of Defendants' motion to summary judgment and, pursuant to Fed. R. Civ. P. 56(d), defer consideration of the motion until discovery has been taken.  *See StrikeForce Technologies, Inc. v. PhoneFactor, Inc.*, 2013 WL 6002850, at *3 (D. Del. Nov. 13, 2013), *as amended* (Nov. 14, 2013) ("If a motion . . . is converted to a motion under Fed. R. Civ. P. 56, a plaintiff is entitled to conduct discovery before the motion can be resolved.")  Discovery will reveal whether material issues of fact exist as to Defendants' status as a single entity.   In particular, discovery is necessary to determine whether the Altegrity Entities exercised de facto control over USIS, e.g., whether the Altegrity Entities ordered the termination of the employees;

10

had common personnel policies with USIS; and whether USIS was operationally dependent on them, e.g., shared administrative or purchasing services, interchanged employees or equipment, and commingled finances.  (*See* April 13, 2015 Declaration of Jack A. Raisner ¶¶ 5-6.)

**2.  The Single Employer Standard.**

Defendants argue that the Complaint does not state a claim against the Altegrity Entities under a single employer theory.  The single employer doctrine is an exception to the doctrine of limited liability.  It generally bars corporations from organizing so as to isolate employment law liabilities among separate entities.  *Murray v. Miner*, 74 F.3d 402, 405 (2d Cir. 1996).  The rationale is that it is fair to expose affiliates to liability despite the fact that they are not at arm's length with the nominal employer in order to enforce federal employee protections, and particularly to expose liability to those who share decision-making authority with the immediate employee.  *Id.* (it is fair to impose "responsibility on an entity that shares decision making authority with the employing entity."); *Woolery v. Matlin Patterson Global Advisers, LLC*, CA 12-726-RGA, 2013 WL 1750429 (D. Del. Apr. 23, 2013) ("circumstances that demonstrate a lack of an arm's length relationship between the companies" should be considered").  The WARN Act was enacted to protect workers, and therefore, the "wrongdoer" should not escape liability merely because "corporate formalities" were observed.  *Pearson v. Component Tech. Corp.*, 247 F. 3d 471, 486-488 (3d Cir. 2001).  A "plant closure often presages a corporation's demise leaving workers without a source of satisfaction from their employer." *Id.* at 476-77.  The WARN Act gives them a path for redress against a parent company that "is demonstrably easier on Appellants than traditional veil piercing." *Id*. at 486.

The WARN Act Regulation enables employees to hold parents of their immediate employers liable as a "single employer" under WARN's "business enterprise" definition of

"employer." 20 C.F.R. § 639.3(a)(1)(2).  It provides that "[i]ndependent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent." *Id*.  It also sets forth relevant factors for courts to use when considering whether to impose WARN Act liability on a parent corporation based on its subsidiary's lack of independence – namely, (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.  *Id*.  (Henceforth, the "DOL Test.") These factors are not rigidly applied but rather should be applied with the flexibility that the area of law requires.  *See Pearson,* 247 F.3d at 491.  **The outcome of a given case does not require these "listed factors" be <u>met</u> or balanced, because it is "not an exhaustive list" and "a number of circumstances not specifically enumerated may be relevant."** *Id.* at 478 (emphasis added).   In the case of a parent-subsidiary relationship, the "directness" of a parent's involvement in the employment decision under dispute is a sliding scale; if the parent has sufficiently overwhelmed its subsidiary in taking the challenged action, such a showing is sufficient to create liability; if the parent was involved to a lesser degree, there must be some demonstration of the presence of the other aspects of the DOL Test.  *Pearson,* 247 F.3d at 487. Besides the lack of arms-length dealings, *de facto* control is perhaps the most important prong of the DOL Test, as it focuses on whether "the parent . . . was the decision maker responsible for the employment practice giving rise to the litigation." *Pearson,* 247 F.3d at 503-04; *In re APA Transp. Corp. Consol. Litig.,* 541 F.3d 233, 245 (3d Cir. 2008) *quoting Pearson* at 503-04.

As noted, the DOL Test is not rigidly applied and each element of the test need not be satisfied for a plaintiff to prevail.  Thus, for example in *Woolery*, 2013 WL 1750429 (D. Del. Apr. 23, 2013), the complaint survived *Iqbal* scrutiny, despite the fact that it only set forth facts supporting one of the five prongs of the DOL Test – the de facto control prong.  There, the complaint alleged only that at a meeting of officials of the subsidiary, that included various individuals alleged to be at least agents of the parent (whom the complaint termed "Defendants' Executives") a statement was made by one of these unnamed individuals indicating that layoffs would occur.   The Court held that the complaint was sufficient because it "specifically allege[d] that Defendants made the decision to shut down the facilities, layoff the employees without 60 days' notice, and enter bankruptcy . . . [the] precise decisions with which the WARN Act is concerned." *Id*.

Thus, the DOL Test offers a flexible approach to determination of the liability of corporate parents in the WARN context, and in most cases, Plaintiffs can ascertain the relevant facts based on quick streamlined discovery into whether the corporate parents mandated or authorized the mass layoff or plant closure at issue.

> **3.  Plaintiffs state a plausible claim for relief against the Altegrity Entities.**

Plaintiffs' allegations, combined with the judicially noticeable facts contained in Defendants' bankruptcy filings, set forth sufficient facts to establish a plausible claim to relief against the Altegrity Entities on a single employer theory.

In *Pearson*, the Third Circuit explained that an allegation that a parent decided to shut down its subsidiary has natural plausibility and credence in the WARN Act context.  The idea that a subsidiary would independently carry out its own dissolution without ever seeking its parent's imprimatur goes against the conventions of corporate structure.  Indeed, as the Third

Circuit pointed out, "the very nature of the acts that give rise to WARN Act liability (a plant

closure) are likely to result from decisions made from the highest levels within the corporate

structure, rendering an examination of a parent corporation's role in the decision more

important." *Pearson,* 247 F.3d at 504.  Therefore, courts have noted that on a motion to dismiss a

claim brought under a single employer theory, it is important to consider the defendants'

corporate structure.  *See Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 139

(S.D.N.Y. 2004).

Thus, in a recent decision by the District of Delaware, *Hampton v. Navigation Capital

Partners*, 2014 WL 4100418 (D. Del. 2014), the Court denied a motion to dismiss a claim

proceeding on a single employer theory and held that "facts which satisfy the first two prongs [of

the DOL test] can[] also be relied on to show that the third prong, de facto control, is satisfied as

well."  *Id*. at *5.  The Court explained that requiring independent facts supporting each prong of

the test is improper, holding that "[g]iven the flexibility that this area of law requires, and the

non-exhaustive nature of the listed factors, Defendant's approach is overly rigid."  *Id. citing

Pearson*, 247 F.3d at 478.  The Court concluded that in the WARN Act context, allegations of

common ownership and management combined with an alleged pattern of "branding, acquisition

and control, is sufficient to render plausible the allegation that the relationship between the

[employer] and [its corporate equity parent] was not at arm's length" and precludes dismissal at

this stage.  *Hampton*, 2014 WL 4100418, at *5.  In other words, the Court reasoned that

Plaintiffs need not allege specific facts which by themselves support each prong of the DOL Test

but instead could bootstrap their allegations such that, e.g., common ownership and management

may also be considered some evidence of de facto control – at least at the pleading stage.  Thus,

the DOL Test is not a rigid construction that requires stringent inquiry and deep discovery to determine every little connection between affiliates.

Plaintiffs present allegations and facts that support a plausible "single employer claim." In this regard, the Altegrity Entities are non-operating or holding companies. (*See, e.g.,* D.I. 240 p. 22:1-3.) Thus, it appears that their only purpose is owning and controlling their subsidiaries, including USIS. In the first day declaration of Jeffrey Campbell, president and CFO of Altegrity, Inc., he lumps together Defendants and all of its debtor and non-debtor subsidiaries and affiliates as a single company. (*See* D.I. 15 at ¶ 5) ("Altegrity, together with its Debtor and non-Debtor subsidiaries and affiliates (collectively, the **'Company'**)"). He goes on to state that USIS was made up of two "divisions," known in shorthand as ISD and GS&S (*id.* ¶ 22), and that the "Company" sold GS&S as "part of its liquidity management efforts" (*id.* ¶¶ 66, 68). He further states that "[t]he Company intends to wind down its [USIS's] services" under its current government contracts. (*Id.* ¶ 22.) Thus, it appears that it is the "Company," which is ultimately headed by the Altegrity Entities, that had the authority to determine whether to sell the remainder of USIS or terminate the employees and wind down its operations. Indeed, it strains credulity that the Altegrity Entities were not involved in the decision-making process that caused USIS to sell its assets and wind down its operations which employed over 5,700 individuals (*id.* ¶ 24), more than the total number of current employees in the entire "Company" (*see id.* ¶ 5), and generated approximately $537 million in the twelve month period preceding June 30, 2014, representing 39% of the "Company's" revenue generated during that period (*id.* ¶ 24). For USIS to have been independent for single-employer purposes, it would have to show that before closing, it had independent counsel and financial advice, sought to chart its own course, and negotiated the best deal it could at arms' length to continue its existence or optimize its value

against its Altegrity parents.  *See Pearson* 247 F. 3d 504-05. Nothing of this sort happened or it surely would have been indicated in the bankruptcy filings.

Plaintiffs allegations and other judicially noticeable facts support the notion that the Altegrity Entities must have been involved in the decision to terminate Plaintiffs and the putative class.  The Campbell Declaration states that the Company "currently employs nearly 3,300 full-time employees."  (D.I. 15 at ¶ 5.)  Thus, Defendants themselves consider the employees of the Altegrity Entities and their debtor and non-debtor affiliates, including USIS, to be employees of the "Company."  In that same vein, the Defendants all shared insurance policies regarding employment practices liability.  (*See* D.I. 240 p. 21; D.I. 242 p. 20; D.I. 245 pp. 22-23; and D.I. 309 pp. 24-25.).

Indeed, Defendants shared approximately 25 insurance policies, comprising almost all of the insurance policies that covered the entities.  (*See* D.I. 240 p. 21;  D.I. 242 p. 20; D.I. 245 pp. 22-23; and D.I. 309 pp. 24-25.)  Likewise, the Defendants all had their books and accounts audited by PricewaterhouseCoopers, LLP within two years of the bankruptcy, and were members of a tax consolidation group, suggesting the use of shared accounting services.  (*See* D.I. 241 pp. 19-20, D.I. 243 pp. 19-20, D.I. 245 pp. 19-20, and D.I. 310 pp.19-20.)

Moreover, the very caption of this bankruptcy, in a footnote, indicates that "[t]he location of the Debtors' corporate headquarters is 7799 Leesburg Pike, Suite 1100 North, Falls Church, VA 22043."  The Defendants have also indicated that "the Debtors routinely engaged in intercompany transactions resulting in intercompany accounts payable and receivable" which were "settled through a series of netting transactions and cash payments."  (*E.g.,* D.I. 310 p. 4.) These facts suggest that the Altegrity Entities and USIS, as well as all of the debtors, may have shared many administrative services and commingled finances.

This should come as no surprise, as the Altegrity Defendants shared common directors with USIS.  (Complaint ¶ 20.)  Defendants' bankruptcy filings confirm that the Altegrity Entities and USIS had an almost complete identity of directors with Charles E. Gottdiener, R. Davis Noell, Steven W. Alesio, Alfred T. Mockett, and Julian Markby serving as directors of all four entities, and Christopher Ragona serving as a director of USIS and all of the Altegrity Entities with the exception of Altegrity, Inc.  (*See* D.I. 241 p. 25, D.I. 243 p. 25, D.I. 245 p. 62, and D.I. 310 p. 76.)

So too, Defendants' bankruptcy filings reveal common officers.  In particular, both David Fontaine and Donald Buzinkai serve as officers of all four Defendants with Mr. Buzinkai serving the exact same role as "senior vice president, finance and treasurer" in all four entities.  (*See id.*)  In another section of their filings, Brett Weinblatt is listed as the vice president of finance for all four entities.  (*See* D.I. 241 p. 19, D.I. 243 p. 19, D.I. 245 p. 19, and D.I. 310 p. 19.)

Finally, the Defendants are commonly owned. (Complaint ¶¶ 17-18.)  Defendants' bankruptcy filings confirm that the Altegrity Defendants are the 100% direct and indirect equity owners of USIS in an immediate chain of ownership  (*See, e.g.*, D.I. 240 p. 22:1-4.)  In fact, Defendants' bankruptcy filings reveal that the Altegrity Entities were previously named USIS Holding Corp., USIS Acquisition Corp., and US Investigations Services, Inc. (*See, e.g.*, D.I. 240 p. 22:1-3.)  Thus, the Altegrity Entities and USIS were so closely related that they even shared a common name.

All of these factors point to a unified entity that made decisions at the top, not a mere agglomeration of 100+ corporate entities, each with their own decision-making authority on the most critical of questions, whether to terminate their employees and wind down their operations.

While this evidence may not be sufficient to ultimately satisfy the DOL Test on summary judgment or at trial, this is not what is required of Plaintiffs at this stage.  Rather, on a motion to dismiss, plaintiffs are not required to make out a *prima facie* case, and must only present allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element.'"  *Fowler*, 578 F.3d at 213.  Guided by the Court's experience and knowledge of corporate structure, *see Iqbal* at 663-64, and the knowledge that in the WARN context it is particularly likely that the ultimate decision-maker makes the ultimate decisions regarding plant closures and mass layoffs, *see Pearson* 247 F. 3d at 504, the Court should conclude that Plaintiffs have set forth sufficient facts to render plausible their claim that the Altegrity Entities were responsible for the termination of Plaintiffs and the rest of USIS's employees as single employers.

While Defendants rely on *Czarniak v. Entertainment Publications, LLC (In re Entertainment Publications, LLC)* 2014 Bankr. LEXIS 1556 (Bankr. D. Del. Mar. 12, 2014), *Sanchez v. AFA Foods, Inc. (In re AFA Inv., Inc.)*, 2012 Bankr. LEXIS 5764 (Bankr. D. Del. Dec. 14, 2012) and *Azzata v. American Bedding Industries, Inc.*, 432 B.R. 115, 123-25 (Bankr. D. Del. 2010) for the proposition that Plaintiffs' allegations are conclusory and insufficient to support a plausible claim for relief that relies on the DOL Test, their arguments are unavailing.

First, as noted, all three of these cases, which are the only cases cited by Defendants to support this branch of their argument, involved dismissal of claims against private equity parents and not mere corporate holding and non-operating parents.  While a private equity parent or grandparent, depending on the facts, may not be sufficiently enmeshed with the ultimate subsidiary employer to support single-employer liability against it, judicial experience and common sense indicate that mere corporate parents that are part of the same "Company" are by

definition related, not independent, and not on equal footing with the entities they control, thus not at arms' length with those entities, even while observing corporate formalities.

Second, Defendants analysis does not consider any of the judicially noticeable facts that are included in their bankruptcy filings.   Plaintiffs' allegations, combined with the judicially noticeable facts enumerated above, paint a very clear picture of a USIS entity that was just the operating arm of the Altegrity Entities, which in all probability controlled its WARN-significant moves.

Third, all three cases cited by Defendants were decided by this Court prior to the District of Delaware's decision in *Hampton*.  The *Hampton* decision emphasized the flexibility inherent in the DOL Test and rejected certain aspects of this Court's previous approach to the analysis under that test.  *Compare Hampton*, at *5 (discussing need for flexibility under DOL Test and the ability to use common officers as evidence under de facto control prong) *with Azzata*, 432 B.R. at 122 (rejecting notion that common directors constituted evidence of de facto control) *and Sanchez*, 2012 Bankr. LEXIS 5764, at *4 (same) *citing Azzata.*

Here, Plaintiffs have presented facts sufficient to meet the standard for pleading set forth in *Hampton* – they have presented sufficient facts that together suggest a relationship that "was not at arm's length," *Hampton*, at *5.   That is all that is needed to make a plausible claim for WARN Act relief under the single employer theory, and that is precisely what Plaintiffs have done here.

In the ordinary course, the inner workings of a corporation are shielded from the employees.  Thus, judicial experience teaches that plaintiffs cannot be expected to quote *in haec verba* a parent corporation's inculpatory statements made in private.  *See e.g., Brinkmeier v. Graco Children's Products Inc.*, at 496 (§ 292 plaintiff must be allowed to plead the elements of

the claim "upon information and belief."); *see also Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010) (a "plaintiff's burden should be commensurate with the amount of information available to [him].")

In this case, not only have the Defendants attempted to shield their corporate decision-making from Plaintiffs, but they have also sought to shield from the public information that is ordinarily provided in the ordinary course of a bankruptcy filing.  (*See*, *e.g.*, D.I. 244 p. 2 (heavily redacted summary of schedules for Altegrity, Inc.; D.I. 348 (Debtors' motion for leave to file supplemental SOFA's and schedules under seal).)  It would be perverse for the Court to reward Defendants for their secretive behavior by dismissing their former employees' claims who are small but legitimate priority creditors based on informational asymmetry in what should be a transparent, equitable bankruptcy process.   This is not a Chapter 11 reorganization – it is a pure liquidation with respect to the employees and USIS division – this is their last and only opportunity to address their claims against the company they supported with their labors until it was run into the ground by those who controlled it.  Congress was greatly concerned about the conduct of those who controlled Altegrity and its USIS services.  The same Congress was greatly concerned that employees are provided with advance notice of their termination or awarding them pay and benefits to smooth their transition to their next source of employment.

**B.  PLAINTIFFS STATE A CLAIM FOR TERMINATION FROM A SINGLE SITE OF EMPLOYMENT WITH 50 EMPLOYMENT LOSSES**

The WARN Act Regulation provides that the single site of employment for workers whose primary duties involve work outside any of the employer's regular employment sites is determined by their home base, the location from which their work is assigned or to which they report.  20 C.F.R. 639.3(i)(6) (the "Regulation").  Plaintiffs' allegations support their claim that they are exactly such employees, and they are therefore covered by the Regulation.  Even if

under the ultimate facts established in this case Plaintiffs might not be covered by the Regulation, determination of this issue is highly fact specific, and it is not amenable to rapid disposition on a motion to dismiss.

Defendants, however, argue that Plaintiffs fail to allege that they were terminated from a single site of employment at which 50 or more employment losses occurred.  Defendants, contend first that the Regulation doesn't apply because Plaintiffs are not "mobile workers," and second that Plaintiffs do not make sufficient factual allegations to support their claim.  But, Defendants ignore established Third Circuit precedent regarding the applicability of the Regulation to remote workers and seek treatment of Plaintiffs' factual allegations as mere conclusory statements.  Therefore Defendants arguments should be rejected.

**1.  The relevant WARN Act regulation applies to Plaintiffs and the employees.**

Defendants argue that Plaintiffs' homes were their worksites and thus there is no single site that can meet the WARN Act's 50-person threshold.  Plaintiffs note that this is USIS's second bite at this apple.  While USIS did not make a motion to dismiss against essentially the same "single site" allegation framed in a now-stayed action brought against it in the U.S. District Court for the Western District of Pennsylvania ("District Court Action"), it raised this very argument with the Court at the Rule 26(f) conference in that case.  Plaintiffs responded that Third Circuit law, precisely, *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139 (3d Cir. 1998), demonstrates that this inquiry requires fact-intensive discovery when disparate employees do not physically report to company sites, as is the case here.  Thus as Defendants state seemingly telepathically here, Plaintiffs rely on *Ciarlante* in opposition to their argument.

Defendants ask this Court to be the first Court in the 27 years of the WARN Act to hold that employees who work from home, outside of their employers' regular fixed worksites, are

considered to work at a home "employment site" and not at the site they report to virtually.  Not only has no Court adopted such an argument, but such a holding would be inconsistent with the terms of the applicable regulation and was tacitly rejected in *Ciarlante* and other cases.  *See Gray v. Oracle Corp.*, No. 2:05-CV-534 TS, 2005 WL 3132344, at *1-2 (D. Utah Nov. 22, 2005) (denying motion to dismiss on ground that plaintiff's single site of employment was purportedly his home office); *Kephart v. Data Sys. Int'l, Inc.*, 243 F. Supp. 2d 1205, 1220 (D. Kan. 2003) (citing *Ciarlante* and holding that there was a material question of fact as to whether employees who worked out of home offices or regional offices were employed at a central office for WARN Act purposes.)  The only case that Defendants have found to support the proposition that a home office is a site of employment, *In re Storehouse, Inc.*, 2010 WL 4453849 (Bankr. E.D. Va. Nov. 3, 2010), did so in *dicta* that is unpersuasive and inconsistent with *Ciarlante*.

In *Ciarlante* sales representatives worked from home and had no other permanent office. 143 F.3d 139, 142.  They alleged that an administrative center in Chester, Virginia was their "single site of employment," *i.e.*, their worksite for WARN Act purposes, because work was assigned to them from that office.  *Id.* at 146-147.

The Court analyzed the issue under the WARN Act's operative regulation.  20 C.F.R. § 639.3(i)(6) (the "Regulation"),  which governs work-from-home employees.   It states:

> For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

20 C.F.R. § 639.3(i)(6) (1989).  *Id.* at 145.

The *Ciarlante* Court specifically applied the "[site] to which they report" test of the Regulation to plaintiffs who spent the great majority of their time travelling from home to

service customers within their geographical district. *Id*. at 141-2.  The plaintiffs did not physically visit the central corporate office in Chester, Virginia during the normal course of business, but presented evidence that they received instructions from that office and reported to that office. *Id*. at 146.  Despite a highly detailed record, the Court determined that it could not affirm summary judgment in plaintiffs' favor because there were still material issues of fact as to whether plaintiffs' work was assigned to them from Chester, Virginia and whether they reported to that site. *Id*. at 148-49.  But the Court took for granted the fact that the Regulation applied. *Id*. at 145.  Plainly, the fact that plaintiffs worked from their homes did not transform their homes into their WARN worksites, as Defendants urge here.

Here, the allegations present a virtually identical set of facts.  Plaintiffs allege that they "traveled from [their] home[s] to perform investigations at various locations," and that their assignments originated from, and reports were filed to Defendants' Grove City and Falls Church facilities.  (Complaint ¶¶ 9-11.)  This puts Plaintiffs' claims well within the framework of the *Ciarlante* Court's analysis, and therefore precludes dismissal of Plaintiffs' claims before a factual record is developed regarding their "single site" of employment.

Because *Ciarlante* contemplates a well-developed factual record before a finding on the issue of an employee's "single site" is made, Defendants resort to a straw man argument in an attempt to distinguish it, claiming that the Regulation is the "mobile employees" regulation and "only" applies to "truly mobile workers without a regular, fixed place of work," like bus drivers and mobile salesperson, and not those like Plaintiffs who "prepared and filed their investigation reports at their home offices" (Defendants' Memorandum of Law ("MOL") at 7-8.)

In the first instance, Defendants argument is misplaced because Plaintiffs do not allege that they prepared and filed their investigation reports at their home offices.  Plaintiffs in fact

allege that they "**traveled from [their] home[s]** to perform investigations at various locations (Complaint ¶¶ 9-11) (emphasis added).  Thus, even under Defendants' interpretation of the Regulation, discovery would be necessary to determine if Plaintiffs did work at home such that the Court could hold that they had fixed places of work – here, home offices – that were their individual sites of employment.  Even assuming *arguendo*, the Plaintiffs prepared reports at home, it would not affect the outcome.  Altegrity gave these employees portable laptops and cars, not office space.  Their "regular [Altegrity] employment sites" were at the opposite end of their connections because "their primary duties involve[d] work outside any of the **employer's regular employment sites** . . . ." 20 C.F.R. 639.3(i)(6) (emphasis added).

In this regard, while Defendants' principally rely on *Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 809 (4th Cir. 2007), its holding is not on point, and it contains language that directly contradicts Defendants' argument.  Defendants argue that in *Meson*, the Fourth Circuit construed homes as "fixed place of work" and denied the application of the Regulation to those who regularly worked from their homes.  (MOL 7-9.)  In fact, the Court did no such thing.  While the *Meson* Court found that the Regulation did not apply to its plaintiff, it did so because she had office space within a small office operated by the defendant.  *Id*. at 810.  The plaintiff nevertheless sought to use the Regulation to skip over that small office and have a more centralized company office deemed her "single site" because she traveled frequently.

The Court found that she had a "fixed place of employment" in her employers office, *id*. at 809, and contrasted her with those who work from their homes..  The Court recognized, as did the *Ciarlante* Court, that people "who work primarily out of their homes and cars . . ." fall within scope of the mobile employee classification while, those, who "work out of fixed offices," like the plaintiff in *Meson,* do not.  *Id*. at 809.  *See Ciarlante* 143 F.3d at 142 (the site from which

salespeople, who worked from homes and cars, received their assignments was determinative of their WARN claim).

Here the Plaintiffs and virtually all the individuals they seek to represent worked from their homes and reported to the fixed locations in the Grove City community, at which the balance of the class worked.  Even if the holding in *Meson* supported the Altegrity Entities' theory, *Meson* would still be inapposite as it was decided at summary judgment after the factual record regarding the plaintiff's site of employment had been fully developed.  *See id.* at 811.

Likewise, in the only other case relied on by Defendants for this argument, *In re Storehouse, Inc.*, 2010 WL 4453849 (Bankr. E.D. Va. Nov. 3, 2010), the Court rejected the plaintiff's claims after a factual record had been developed at a hearing.  *See id.*, at *1.  In *Storehouse*, the plaintiff worked out of a small company office with other company employees. *See id.*  The Court rejected his argument that his true site of employment was a larger corporate office despite the fact that he spent significant time traveling and instead concluded that the smaller office was his site of employment for WARN Act purposes.  *Id.*, at *3.  The Court specifically noted that the plaintiff in *Meson* "was not considered a mobile worker because she worked out of a particular office and managed two employees there" *id.*, underscoring *Meson*'s inapplicability to this action.

While the *Storehouse* court stated in *dicta* that if the plaintiff had worked from home, it would have been his single site of employment since it would have been his fixed workspace when he was not traveling for work," *id.*, this analysis is not binding on this Court, is not persuasive, and contradicts the holding of *Ciarlante*.  In fact, the Court also specifically disclaimed any notion that it was deciding how all telecommuters should be treated under the WARN Act stating that its decision should not "be considered an opinion on all situations

involving telecommuters." *Storehouse* at *4, n.3.  Thus, even Defendants' best case acknowledges that the determination of "single site of employment" is a fact-specific inquiry and therefore the *Storehouse* Court limited its decision to its facts adduced at a hearing.

Defendants further argue in their brief that because the terminated employees were part of a large workforce located in geographically distinct locations, the Regulation cannot make the Grove City or Falls Church facilities those employees' "single site."  (MOL at 9).  While *Meson* and *Storehouse* both suggest that far flung and remote employees are not covered by the Act, *see Meson*, 507 F.3d at 803; *Storehouse*, 2010 WL 4453849, at *4, this is not the only purpose of the act, which also serves to protect the employees themselves and their families.  *See* 20 C.F.R. § 639.1 (The WARN Act "provides protection to workers, their families and communities"); *see also United Steelworkers of Am., AFL-CIO-CLC v. Crown Cork & Seal Co., Inc.,* 32 F.3d 53, 58 (3d Cir. 1994) *aff'd sub nom. N. Star Steel Co. v. Thomas*, 515 U.S. 29 (1995) (indicating same); *Moore v. Warehouse Club, Inc.,* 992 F.2d 27, 30 (3d Cir.1993) (holding that the purpose of the WARN Act is "to ensure adequate opportunities . . . for retraining and/or reemployment").

Importantly, the *Ciarlante* Court did not think twice about applying the Regulation to telecommuters who were dispersed throughout geographic districts around the country.  In fact, the dissent highlighted the fact that the majority had considered this issue and stated that "[t]his is the first time that a court has been asked to apply 20 C.F.R. § 639.3(i)(6) to determine the single site of employment for a geographically dispersed workforce that does not physically report to any site of employment at any time," that "such situations represent the new frontier in WARN Act litigation" and that the "the majority has recognized the possibility that such plaintiffs may prevail within the framework of 20 C.F.R. § 639.3(i)(6)."  *Ciarlante*, 143 F.3d at 156 (Becker, C.J., dissenting).

Finally, with respect to Defendants' contention that the Regulation only applies to salespeople and bus drivers and their ilk, which are the examples specifically enumerated in the regulation, and apparently not to employees such as plaintiffs, who worked from home, this proposition finds no support in any of the case law cited by Defendants and is inconsistent with the language of the regulation.

In this regard, the Regulation provides that it applies to "workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (**e.g.**, railroad workers, bus drivers, salespersons).  639.3(i)(6) (emphasis added).  Defendants seek to use the examples given after the "e.g." to limit the regulation "pursuant to its terms," (MOL at 9), and greatly restrict the more broad language contained in the preceding text.

This limitation makes no sense as those examples do not capture the full range of employees who, for example, may be outstationed.   Moreover, use of the term "e.g." simply means that the following terms are to be used as representative examples, and not as limitations. *See*, *e.g.*, *New v. Dep't of Veterans Affairs*, 142 F.3d 1259, 1265 (Fed. Cir. 1998) (noting that the use of the term i.e., in a regulation is meant to restrict to the specific example, whereas, e.g., means "for the sake of an example."); *see also Fergueson v. Barnhart*, 52 F. App'x 112, 115 (10th Cir. 2002) (e.g. "is an abbreviation for the Latin phrase *exempli gratia* and is used to introduce representative examples.") (internal quotations and alterations omitted); *Otter Products, LLC v. Treefrog Developments Inc.*, No. 11-CV-02180-WJM-KMT, 2012 WL 4468211, at *22 (D. Colo. Sept. 27, 2012) ("'encloses, i.e. completely surrounds the separate touch screen device' is a further clarification of the word 'encloses' where[as] 'encloses, e.g. completely surrounds the separate touch screen device' would be but one example of how the

27

word 'encloses' is being used."); *Jones v. Burton*, No. 05-C-527-C, 2005 WL 2373859, at *3 (W.D. Wis. Sept. 26, 2005) *aff'd*, 173 F. App'x 520 (7th Cir. 2006) (noting the difference between the "limiting term *id est*" and "the more comprehensive *exempli gratia*").

This broad interpretation of the Regulation is consistent with the framework set forth in *Ciarlante* and applied in cases following it.  As noted above, the *Ciarlante* dissent specifically elucidated that the majority opinion opened the possibility that all forms of telecommuters "may prevail within the framework of 20 C.F.R. § 639.3(i)(6)," which Chief Judge Becker declared was critically important because, "[i]n the next decade, technology will permit workers of all types, not just salespeople or other mobile workers, to escape the physical confines of traditional offices."  *Ciarlante*, 143 F.3d at 156.

Finally, while Defendants do not cite to a single case that supports their contention, other courts have applied the regulation to employees other than bus drivers and their ilk.  *See Kephart v. Data Sys. Int'l, Inc.*, 243 F. Supp. 2d 1205, 1220 (D. Kan. 2003) (applying Regulation to computer consultants and services employees who worked from home offices); *Bader v. N. Line Layers, Inc.*, 503 F.3d 813, 815 (9th Cir. 2007) (applying *Ciarlante* framework for analysis of single site of employment to construction workers and project managers, but granting summary judgment to employer because employees failed to show that they reported to, were assigned work from, or had a home base at centralized location); *Gray v. Oracle Corp.*, 2005 WL 3132344, at *1-2 (D. Utah Nov. 22, 2005) (denying motion to dismiss information technology worker's complaint on ground that plaintiff's single site of employment was purportedly his home office).

Defendants' arguments that Plaintiffs are not covered by the Regulation as a matter of law should not be credited.

**2. Plaintiffs made sufficient factual allegations to supporting application of the "mobile workers" regulation to their claims.**

Faced with the fact that Third Circuit law is inconsistent with their position that Plaintiffs are not covered by the Regulation, Defendants retreat to their all-purpose redoubt which is to complain that Plaintiffs have not made any factual allegations.

Defendants contend that the test for determining a site of employment under the Regulation is not where top managerial authority was located, or where the information Plaintiffs prepared eventually ended up, but rather where the person worked who primarily gave a Plaintiff his or her day-to-day instructions, and where the person worked to whom a Plaintiff primarily reported. (MOL at 10 *citing Ciarlante*, 143 F.3d at 147-49.)

In the first instance, the Defendants have misread *Ciarlante*. The *Ciarlante* Court specifically held that the relevant inquiry for determination of the site from which work was assigned is "the true source of the instructions" not, "mere conduits through which the instructions passed." 143 F.3d at 147. Likewise, the location to which employees report is "the location of the personnel who were primarily responsible for reviewing . . . information sent by the sales representatives," *id.* at 148, not the location of the individual to whom an employee directly reported as Defendants suggest. Thus, for example, the Court considered a statement by a middle manager that he "would facilitate the [central] office by collecting the information and forms from the . . . sales representatives, and [by] then funneling them to the [central] office" as evidence that the employees reported to the central office, not the middle manager. *Id*. at 148.

Defendants, relying on their erroneous interpretation of *Ciarlante*, argue that Plaintiffs made no factual allegations regarding the details of the specific person(s) from whom they received instructions and to whom they reported and the location(s) of those person(s). Defendants contend that Plaintiffs merely made conclusory allegations that they received

instructions from and reported to the Facilities and that these allegations, which mimic the Regulation's language are conclusions and not facts.  (MOL at 10-11.)

But Plaintiffs allege that their assignments originated from, and reports were filed to Defendants' Grove City and Falls Church facilities (Complaint ¶¶ 10-11.)  Defendants do not explain how these are legal conclusions and not factual allegations.  Rather, they simply seek to capitalize on the often slippery distinction between the two.  However, these allegations are not mere legal conclusions such as "defendants entered a contract" or "defendant negligently drove" *See Bell Atl. Corp. v. Twombly*, 550 U.S. at 576, 590 (Stevens, J., dissenting) (expressing that "defendant negligently drove" and "defendants entered a contract" are examples of allegations that would be considered legal conclusions pursuant to the majority opinion).  The flaw in those allegations is that they presuppose the ultimate legal question of negligence or formation of a contract.  But Plaintiffs did not plead the analogous legal conclusion that their single site of employment was the Grove City or Falls Church facility.  Rather, Plaintiffs alleged facts regarding where they believe their instructions were coming from and where they believe their finished reports were sent.

In order to prevail on a motion to dismiss, all a plaintiff must do is set forth allegations that render their claims "plausible on [their] face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  This is exactly what they have done here.  Plaintiffs do not know for certain exactly where their reports were sent or where their instructions were coming from.  But, Plaintiffs allegations, taken as true, set forth a plausible claim under a theory that Grove City or Falls Church were their single sites of employment and that over 50 employees were terminated at those locations – these allegations are therefore sufficient to unlock the door to discovery which will allow for the detailed analysis that *Ciarlante* contemplated to be performed at summary judgment or trial.

While it may be true that the facts ultimately show that Plaintiffs received instructions from and reported to individuals at another site that did not have 50 terminated employees and that they are assigned to that location for WARN Act purposes, that is not what Plaintiffs alleged, and Plaintiffs need not "plead facts that foreclose the possibility of its not prevailing at trial." *Brinkmeier*, 767 F. Supp. 2d at 495-96.

Moreover, if Plaintiffs were required to plead the specific details regarding the links in the chain of how their assignments were sent out and to where they reported, that would give all companies with telecommuting employees the means to evade WARN Act liability by setting themselves up to wall off this information from view and foreclose discovery into the factual details as Defendants attempt to do here.  The Court should not abide by a crabbed pleading standard for "single site" that would undermine a broad remedial statute.

### C.  IF THE COMPLAINT IS DISMISSED, PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND

If the Court dismisses all or part of the Complaint, which Plaintiffs respectfully contend it should not, Plaintiffs should be granted leave to file an amended complaint.  "[L]eave to amend should be freely given, unless the amendment would be futile, or there is evidence of undue delay, bad faith, or undue prejudice."  *Tracinda Corp v. Daimler Chrysler AG (In Re Daimler Chrysler AG Sec. Litig.)*, 200 F. Supp. 2d 439, 443 (D. Del. 2002) (granting leave to amend); *see also Hechinger Investment Co. v. Raytheon Co. (In Re Hechinger Investment Co.)*, 286 B.R. 591, 593-94 (Bankr. D. Del. 2002) (granting leave to amend).

Defendants concede that generally, "when granting a motion to dismiss at the outset of a case, leave will be freely granted to amend the complaint."  (MOL at 15 *citing Shane v. Fauver*, 213 F.3d 113, 115-16 (3d Cir. 2000) (reversing lower court's dismissal with prejudice and without leave to amend in PLRA case).)  Defendants, however, argue that amendment would be

futile in this case.  But, Defendants fail to cite a single case denying leave to amend on that

ground, let alone such a case in the WARN Act context.  Moreover, Defendants fail to note that

in the two cases which they principally cite to in favor of dismissal of the single employer claim

against the Altegrity Entities, leave to amend was granted.  *See Czarniak* ("[T]he Court will

grant the MH Entities' motion to dismiss without prejudice and provide plaintiff with leave to

file an amended complaint . . . ."); *Sanchez*, at *6 ("In this case, the Court does not find bad faith,

undue prejudice, or futility. The Court will, therefore, grant Sanchez 30 days to amend the

Complaint."); *cf. Azzata*, 432 B.R. at 117-18 (dismissing amended complaint with prejudice).

Crucially, an amended Complaint here would not be futile.  If Plaintiffs are granted leave

to amend, their allegations would address all of the purported deficiencies in their Complaint and

include, *inter alia*, (a) detailed factual allegations regarding the location from which Plaintiffs

and putative class members' work was assigned and to where they reported, derived in part from

Plaintiffs' counsel's interviews with putative class members and in part from limited document

production made by USIS under a protective order in the District Court Action, (b) documentary

evidence of Defendants' shared employment policies obtained from putative class members,

including documents demonstrating that USIS employees participated in an Altegrity, Inc.'s

401(k) plan, as well as (c) further information regarding the sharing of administrative or

purchasing services, derived from the limited document production made by USIS in the District

Court Action.  While counsel did not use confidential documents obtained in the District Court

Action in crafting the Complaint on the opinion that a publically filed complaint is preferred to

one filed under seal, particularly in the case of a class-action complaint, this information could

be incorporated into an amended complaint, filed under seal, if necessary.

Further, if the Court adopts Defendants legal argument on the single site theory and dismisses the Complaint on the ground that the Regulation (20 C.F.R. 639.3(i)(6) does not apply to Plaintiffs as a matter of law, Plaintiffs can add allegations in order to plead entirely new theories such as that the Plaintiffs were employed at a single site because their home offices may all be considered together as a single site of employment in various geographic regions, *see* 20 C.F.R. § 639.3(i)(3), or that plaintiffs were part of a single site of employment because their circumstances present a "truly unusual organizational situation" *see* 20 C.F.R. § 639.3(i)(8).

Finally, if the Court does not take judicial notice of the facts set forth in Defendants' bankruptcy filings as discussed above, Plaintiffs would also include those facts in any potential amended complaint.

In any event, Defendants do not present any basis for their assertion that amendment would be futile other than that they "believe" that Plaintiffs do not "have facts" permitting them to frame a proper pleading.  (MOL at 15.)  Defendants do not even contend that such facts do not exist but simply that in their view, those facts are not within Plaintiffs' possession.  Thus, Defendants' position merely serves to underscore the propriety of going forward with discovery in this action whether upon this Complaint or an amended one.  Moreover, Plaintiffs note that it is the height of cynicism for Defendants to argue that Plaintiffs be denied leave to replead because they purportedly have no facts to support their claims at the very time when Defendants have been and continue to make certain of these facts available through the bankruptcy process. Defendants seek to close the door on their former employees' right to judicial process at the very moment that they are availing themselves of significant judicial resources to engage in a reorganization process.  The Court should respectfully not condone this contemptuous request.

Ultimately, Defendants present no evidence of undue delay, bad faith, or undue prejudice and as demonstrated above, an amended complaint would not be futile.  Accordingly, in the event that the Court dismisses all or part of the Complaint, which it respectfully should not, it should also grant leave to file an amended complaint.

## CONCLUSION

For all the foregoing reasons, Plaintiffs request that Defendants' motion be denied, or in the alternative, converted in part to a motion for summary judgment with consideration of that motion stayed until discovery is completed.  In the event that Defendants' motion is granted, in whole or in part, Plaintiffs should be granted leave to file an amended complaint.[5]

Dated: April 13, 2015

Respectfully submitted,

/s/ Jack A. Raisner
Jack A. Raisner, *Pro Hac Vice*
René S. Roupinian, *Pro Hac Vice*
OUTTEN & GOLDEN LLP
3 Park Avenue, 29th Floor
New York, NY 10016
Telephone: (212) 245-1000
E-mail: rsr@outtengolden.com
          jar@outtengolden.com

--and--

Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, Delaware  19801
Telephone: (302) 654-0248
E-mail:loizides@loizides.com

*Counsel to the Plaintiffs and the putative class*

---

[5] As previously noted, Plaintiffs concede that their claim should not be awarded an administrative expense priority as a matter of law.  Accordingly, they consent to the dismissal of that prayer for relief with prejudice.